RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0335p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

TRUSTEES OF THE DETROIT CARPENTERS
FRINGE BENEFIT FUNDS,
       *Plaintiffs-Appellants/Cross-Appellees,*

     *v.*

INDUSTRIAL CONTRACTING, LLC, a Michigan
limited liability company, and LASALLE
GROUP, INC., a Michigan corporation,
       *Defendants-Appellees/Cross-Appellants.*

Nos. 08-1457/1994

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-71141—John Corbett O'Meara, District Judge.

Argued: March 11, 2009

Decided and Filed: September 17, 2009

Before: BATCHELDER, Chief Judge; DAUGHTREY and MOORE, Circuit Judges.

———————————

## COUNSEL

———————————

**ARGUED:** Walter B. Fisher Jr., FILDEW HINKS, PLLC, Detroit, Michigan, for Appellants. Steven A. Wright, STEVEN A. WRIGHT, P.C., Shelby Township, Michigan, for Appellees. **ON BRIEF:** Walter B. Fisher Jr., Charles S. Kennedy, III, FILDEW HINKS, PLLC, Detroit, Michigan, for Appellants. Steven A. Wright, Sandra L. Wright, Patrick J. Carleton, STEVEN A. WRIGHT, P.C., Shelby Township, Michigan, Gene J. Esshaki, ABBOTT NICHOLSON, P.C., Detroit, Michigan, for Appellees.

———————————

## OPINION

———————————

MARTHA CRAIG DAUGHTREY, Circuit Judge. The plaintiffs in this labor dispute are trustees of an association of various benefit funds established under the Labor-Management Relations Act of 1947 (LMRA), 29 U.S.C. §§ 141-67, 171-97, and the

Employee Retirement Income Security Act of 1974 (ERISA), as amended, 29 U.S.C. §§ 1001 - 1461, and maintained for the benefit of members of the Michigan Regional Council of Carpenters, AFL-CIO (the union). They filed this action against defendants Industrial Contracting, LLC, and LaSalle Group, Inc., claiming that "[f]or all relevant purposes, [the two companies] are one and the same, constituting a single employer, with each being the alter ego of the other" and seeking to audit the books of both defendants to verify the accuracy of the contributions that they were contractually obligated to make to the plaintiffs under the provisions of the collective bargaining agreement (CBA) between the union and Industrial Contracting.

The district court granted summary judgment in favor of the defendants, based on its determination that, as a matter of law, the "alter ego" doctrine was inapplicable in this case because the plaintiffs had "failed to present any evidence to show that Industrial was formed or operated with the intended purpose of evading any of LaSalle's preexisting contractual obligations." We conclude that this decision cannot be reconciled with our opinion in *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576 (6th Cir. 1986), in which we held that "a finding of employer intent is not essential or prerequisite to imposition of alter ego status. . . . [but] is merely one of the relevant factors which the [courts] can consider." *Id.* at 581. We therefore reverse the district court's judgment and remand the case for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

As we noted in *Allcoast Transfer*, "th[e] factors relevant to a finding of alter ego status include 'whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision and ownership.'" *Id.* at 579 (quoting *Nelson Electric v. NLRB*, 638 F.2d 965, 968 (6th Cir. 1981)). Our inquiry, then, begins with a review of the evidence, largely undisputed, that was supplied at the summary judgment stage of the litigation. That evidence established that the funds are beneficiaries of a CBA signed between the Michigan Regional Council of Carpenters and Detroit-area employers in the construction industry. The CBA requires employers to make contributions to the funds on behalf of covered employees, including fringe benefits that are calculated based on either the hours worked by covered employees or a percentage of the employees'

base wages. The contract also covers subcontracting ("[n]o employer shall subcontract or assign any of the work described herein which is to be performed at a job site to any contractor, subcontractor or other person or party who fails to agree in writing to comply with the conditions of employment contained in the Agreement") and alter-ego operations. The contract clause covering the latter provides that if "work of the type covered by this Agreement" is performed by any entity, regardless of under what name it is performed,

> wherein the Employer (including its officers, directors, owners, partners, or stockholders) exercises either directly or indirectly (such as through family members) any significant degree of ownership, management, or control, the terms and conditions of this Agreement shall be applicable to all such work and to such successor or alter ego entity.

The controversy arose because of the overlapping establishment and convergence of the defendant companies. LaSalle was incorporated in 1990. Steven Palermo became a minority owner of LaSalle in 1995 and a majority owner approximately five years later. Although LaSalle was a signatory to the CBA with the union at the time Palermo purchased his ownership interest, the company declined to renew the contract when it expired on June 1, 2003. In the meantime, Steven Palermo and his brother Randy had formed another company in 2001 that was the predecessor to Industrial Contracting, LLC. Three years later, Steven Palermo sold his half-interest in Industrial Contracting to his former brother-in-law, Chester Jablonski, who purchased an additional 1.8 percent interest from Randy Palermo. Industrial Contracting was not a signatory to any CBA until it entered an agreement with the union on June 1, 2003, at the same time that LaSalle terminated its relationship with the union.

In addition to his majority interest in Industrial Contracting, Jablonski was LaSalle's chief financial officer and had previously served as its vice president, secretary, and treasurer. He managed the day-to-day operations for both Industrial Contracting and LaSalle, and he acted as the contact with the union for both companies. Jablonski testified that he had the authority to sign Steven Palermo's signature on LaSalle documents for "pretty much whatever I need his signature on."

According to the LaSalle website as accessed in 2006, the company was a general contractor and construction management company that had a total of 110 field employees,

including in-house carpenters and other tradespeople.  However, in a deposition taken in September 2003, a LaSalle official said that the company did not hire tradespeople directly at that time and had only ten laborers on its payroll, down from the "40 or 50" workers employed by LaSalle on June 1 of that year, at the termination of its collective bargaining agreement with the union.  Industrial Contracting was a subcontractor that provided labor and supervision for construction projects, also referred to by Jablonski as an "employee leasing company." At the time the lawsuit was filed, Industrial Contracting had never supplied laborers to any company other than LaSalle.

LaSalle and Industrial Contracting shared many of the same supervisory personnel during the relevant period.  For example, Matthew Bertrang and Dave Walasek were listed as employees and supervisors at both companies.  Dave Walasek, a labor superintendent and union member, worked for LaSalle until "they switched over," when he was notified by Wes Gerecke, the Field Operations Manager for LaSalle, that he would be working for Industrial Contracting.  He testified that his job did not change in any way after he went to work for Industrial Contracting and that Wes Gerecke continued to exercise direction over the projects on which he worked.  Matthew Bertrang, a carpenter superintendent and union member, worked for LaSalle until the middle of 2003.  After LaSalle terminated its collective bargaining agreement, Bertrang testified that he was given the choice of looking for another job or working for Industrial Contracting.  Bertrang, too, said that his job did not change when he moved to Industrial Contracting and that his "direct boss" was Wes Gerecke.  Gerecke also assigned Bertrang to various projects and procured equipment for him.  Gerecke testified that he supervised Industrial Contracting employees and monitored their needs for material, equipment, and manpower on a day-to-day basis.

At the time the dispute arose, Industrial Contracting and LaSalle were housed in the same building and had rental agreements with the same real estate company, owned by Steven Palermo. LaSalle paid $9500 a month for the building, and Industrial Contracting rented an office in the building for $200 a month.  Before 2005, Industrial Contracting employees received reimbursement checks from LaSalle's account and were covered by LaSalle's workers' compensation insurance policy.  In addition, LaSalle paid for Industrial Contracting's general liability insurance policy and Industrial Contracting employees

continued to use LaSalle's telephone system and LaSalle business cards. Until 2005, Industrial Contracting billed LaSalle only for its wages and direct costs; in 2005 Industrial Contracting began charging a three-percent markup. During the same period, Industrial Contracting did not own its own equipment, but instead used equipment owned by LaSalle, the use of which LaSalle did not track.

Several LaSalle documents in the record refer to Industrial Contracting employees as LaSalle employees. For example, on the "GM Catering Kitchen" job, the daily report lists the superintendent and foreman as LaSalle employees when they were actually employed by Industrial Contracting. Likewise, on a bid for the "GM Hines Theater" project, an Industrial Contracting employee is listed as a LaSalle employee. For the "DCX Walbridge Aldinger" project, LaSalle was placed on an approved list for bids for which only union signatories were eligible, and a Walbridge Aldinger project manager testified that he mistakenly thought that LaSalle was a union signatory. Moreover, LaSalle failed to list Industrial Contracting as a subcontractor on DCX project documents requiring a list of all subcontractors. LaSalle also submitted invoices for work done by Industrial Contracting employees on the DCX project as "self-perform" work, enabling the company to charge five percent more for work purportedly performed "in house" by LaSalle.

Despite the virtual mountain of evidence establishing the intermingling of the two companies, the district court granted the defendants' motion for summary judgment, holding that, even though the plaintiffs "ha[d] shown most of the similarities between LaSalle and Industrial that were required under *Fullerton*,"[1] the defendants were entitled to prevail as a matter of law simply because the record was devoid of "any evidence to show that Industrial was formed or operated with the intended purpose of evading any of LaSalle's preexisting contractual obligations." The plaintiffs now appeal that ruling and also complain that the district court improperly struck a portion of the brief they filed in response to the defendants' motion for summary judgment, in which they raised an alternative theory of recovery that had not been raised prior to the close of discovery.

---

[1] *NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331 (6th Cir. 1990).

The defendants have filed a cross-appeal, contending that as prevailing parties below, they should have been awarded costs and attorneys' fees.

The latter two rulings represent an exercise of the district court's discretion, and nothing in the record suggests to us that the court abused its discretion in reaching the decisions that it did. Moreover, in view of the result we reach today, both of these issues have become moot and, therefore, need not be resolved.

### DISCUSSION

A district court's grant of summary judgment is reviewed de novo, *see International Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006), and is appropriate when there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In considering a motion for summary judgment, we must view the inferences to be drawn from the underlying facts in favor of the non-moving party, in this case the plaintiffs. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Questions of fact, including a district court's factual determination that two companies are (or are not) alter egos, are reviewed for clear error. *See Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571, 587 (6th Cir. 2006).

The alter ego doctrine is an equitable doctrine "developed to prevent employers from evading obligations under the [National Labor Relations] Act merely by changing or altering their corporate form." *Allcoast Transfer*, 780 F.2d at 579. The doctrine operates to bind an employer to a collective bargaining agreement if it is found to be an alter ego of a signatory employer. *See id.* at 582-83. We have addressed alter-ego operations that occur in two factual contexts. The first is when the new entity begins operations but is "'merely a disguised continuance of the old employer.'" *NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331,336 (6th Cir. 1990) (quoting *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106 (1942)). The second is what is referred to as a "double-breasted operation," where "two or more coexisting employers

performing the same work are in fact one business, separated only in form." *Fullerton Transfer*, 910 F.2d at 336.

The Sixth Circuit test for determining whether two companies are alter egos has been adopted from the case law of the National Labor Relations Board. We look to see "'whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership.'" *Id.* (quoting *Nelson Elec. v. NLRB*, 638 F.2d 965, 968 (6th Cir. 1981)). In applying these factors, no individual factor is outcome determinative; instead, "all the relevant factors must be considered together." *Allcoast Transfer*, 780 F.2d at 582. Under Sixth Circuit precedents, moreover, an employer's intent to evade the obligations of a collective bargaining contract is merely one of the factors to be considered and is not a prerequisite to the imposition of alter-ego status. *Fullerton Transfer*, 910 F.2d at 337. We came to this conclusion based on our reasoning that "an employer who desired to avoid union obligations might be tempted to circumvent the doctrine by altering the corporation's structure based on some legitimate business reason, retaining essentially the same business, and utilizing the change to escape the unwanted obligations." *Allcoast Transfer*, 780 F.2d at 582; *see also Wilson v. Int'l Bhd. of Teamsters*, 83 F.3d 747, 759 (6th Cir. 1996) ("[C]ommon ownership or an intent to evade federal labor law obligations are not necessary prerequisites to a finding of alter ego status.").

In double-breasting cases, we have confronted two common fact patterns: (1) the "classic" double-breasting operation in which a union contractor creates a second, non-union company, and (2) the "reverse" double-breasting situation in which a non-union company opens a sister company that becomes a union signatory. A paradigm example of classic double-breasting can be found in *Allcoast Transfer*, in which the respondent, a unionized moving and storage company, formed an ostensibly separate non-union corporation in order to serve as a licensee for a nationwide moving company. *See* 780 F.2d at 578. We upheld the NLRB's determination that the two companies were alter egos because they had substantially "identical management and supervision," the same business purpose, and the same employees and equipment. *See id.* at 582.

An example of reverse double-breasting was involved in *Trustees of the Resilient Floor Decorators Insurance Fund v. A&M Installations, Inc.*, 395 F.3d 244 (6th Cir. 2005). In that case, a former employee of a non-union carpet sales company started a carpet installation company that hired union labor. The companies shared office and warehouse space and secretarial staff, and the president of the installation company was the former brother-in-law of the president of the sales company. *See id.* at 246-47. We found that the two companies were not alter egos, however, on alternative bases: (1) because the non-union carpet sales company had no preexisting labor obligations to evade, (2) because there was no "pervasive intermingling of funds and operations" as found in other alter ego cases, and (3) because the installation company's workers were, in fact, independent contractors and not "employees" under ERISA. *See id.* at 248-49, 251.

In this case, the district court relied upon our observation in *Resilient Floor* that the union had "disregard[ed] the fact that 'an intent to evade' preexisting obligations is 'clearly the focus of the alter ego doctrine'" and that, in the absence of proof that the union had been short-changed in some manner by changes in the structure of the two entities involved in the dispute, there could be "no inequity that would justify a court's imposition of liability." *Id.* at 248 (quoting *Cement Masons' Pension Trust Fund v. O'Reilly*, 664 F.Supp. 277, 279 (E.D. Mich. 1987)). The district court also relied on an unpublished district court opinion from the Eastern District of Michigan, *Cement Masons' Trust-Fund v. McCarthy*, 2006 WL 770444 (E.D. Mich. 2006), quoting that opinion as holding that the Sixth Circuit has "categorically rejected application of the alter ego doctrine in the . . . situation [in which] . . . a nonunion company establishes a union company and no preexisting labor obligations are disrupted." *Id.* at *4 (quoting *Resilient Floor*).

We conclude that the district court's analysis does not stand up to *de novo* review. The *Resilient Floor* opinion is of limited authority, given its alternative holdings and its ultimate conclusion that the workers in question were independent contractors and not, in fact, covered employees. Moreover, the excerpt from *Resilient Floor* quoted

by the district court  – that "'an intent to evade' preexisting obligations is 'clearly the focus of the alter ego doctrine'" – is taken from the statement in *Allcoast* that "[t]he alter ego doctrine was developed to prevent employers from evading obligations under the [LMRA] merely by changing or altering their corporate form."  *Allcoast*, 780 F.2d at 579.  But, confusing the *purpose* of the alter ego doctrine with the Sixth Circuit's *test for determining whether it should be applied* apparently led the district court in this case to conclude – incorrectly –  that evidence of an intent to evade was a prerequisite to the doctrine's imposition.

It bears repeating at this point that evidence of an intent to evade, when it presents itself, is a relevant factor to be considered in determining whether the alter ego doctrine is applicable, along with "the well-established factors of substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership" – but it is *not* essential to the imposition of alter ego status.  *Id.* at 581; *see also Fullerton Transfer*, 910 F.2d at 337 ("[T]his Circuit has not required . . . a showing of employer intent in order to apply the liberalized alter ego standard. . . . [because] intent can too easily be disguised."). To the extent that *Resilient Floor* can be seen to conflict with the holding in *Allcoast Transfer* and *Fullerton Transfer*, we suggest that it should be confined to its facts.

That brings us to the application of the recognized factors to the situation in this case.  As noted above, the record is replete with evidence of entanglement between LaSalle and Industrial Contracting.  The defendants do not contest those facts on appeal, nor could they, given the documentary nature of the plaintiffs' proof.  Instead, they maintain that they have never acted purposefully to evade union obligations and that it is the plaintiffs who were guilty of "culpability or bad faith" in suing the defendants "concerning on-going audits with which [the defendants] were already cooperating." Under these circumstances, we conclude that summary judgment should have been entered in favor of the plaintiffs, and we therefore remand the case to the district court with instructions to enter such an order.

### *CONCLUSION*

For the reasons set out above, the judgment of the district court is REVERSED, and the case is REMANDED for entry of judgment in favor of the plaintiffs.