NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0216n.06

No. 08-1966

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Apr 07, 2010

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| TRUSTEES OF THE PAINTERS UNION DEPOSIT FUND, | ) ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| INTERIOR/EXTERIOR SPECIALIST COMPANY, et al., | ) ) ) | |
| | ) | ON APPEAL FROM THE |
| Defendants-Appellants, | ) ) | UNITED STATES DISTRICT COURT FOR THE EASTERN |
| v. | ) ) | DISTRICT OF MICHIGAN |
| | ) | |
| PAINTERS DISTRICT COUNCIL NO. 22 OF THE INTERNATIONAL BROTHERHOOD OF PAINTERS AND ALLIED TRADES (AFL-CIO), | ) ) ) ) | |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE:  MERRITT, GIBBONS, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge.  In this labor relations appeal, Interior/Exterior Specialists Co. (IES), a Union painting contractor, and The Llamas Group (TLG), a non-Union general contractor, challenge the district court's decision that they are alter egos and therefore owe fringe benefits to a Union fund for both firms' painting work.  IES and TLG also challenge the district court's conclusion that federal labor law preempts their third-party claims and counterclaims for defamation and the district court's denial of IES's third-party claims for discrimination and restitution.  The district court, however, applied the correct legal standard for determining alter ego liability, and the

district court's factual findings for alter ego liability are not clearly erroneous. In addition, because Union officials did not make the statements that allegedly defame IES and TLG with actual malice, IES and TLG's defamation claims fail. The district court also properly rejected IES's claim of discrimination based on IES's Hispanic ownership and IES's independent restitution claim.

## I.

IES is a Hispanic-owned painting contractor founded in 1997, with Mr. Rito Julien Llamas as sole shareholder, officer, and director. In 1998, IES and Painters District Council No. 22 of the International Brotherhood of Painters and Allied Trades (the Union) concluded a collective bargaining agreement (CBA) that requires IES to pay a set fringe benefit amount to the Painters Union Deposit Fund (the Fund) for every hour that IES painters work. If IES's payments are delinquent, IES must pay liquidated damages. IES officially terminated the CBA effective May 31, 2004. TLG was formed in 1999 with Mrs. Julie Llamas, Mr. Llamas' wife, as sole shareholder, officer, and director. TLG is a non-Union general contractor that does design, building, concrete, and masonry work. Until May 21, 2004, TLG also did painting work. In July and August 2003, after Union officials learned that TLG painters were doing a job that IES was supposed to perform, the Union picketed TLG's worksite with signs accusing TLG of paying unfair wages.

On August 21, 2003, the Union filed a National Labor Relations Board (NLRB) charge against IES "d/b/a" TLG. The Union alleged that for six months, IES and TLG had worked as an illegal double-breasted operation and failed to pay CBA-required wages and fringe benefits. In November 2003, IES employees complained that they were not receiving fringe benefit

contributions, and the Union requested a comprehensive audit of IES. In February 2004, the Fund sued IES for alleged CBA violations and failure to pay fringe benefits, and sought a comprehensive audit of IES's books and records to determine the amount owed. On March 23, 2004, IES notified the Union that IES was terminating the CBA, effective May 31, 2004. On May 21, 2004, the Union agreed to drop its NLRB charge if TLG ceased painting work and IES placed a Union steward on two existing projects. The Union also agreed to recommend to the Fund that the Fund's suit against IES be dismissed without prejudice. The Fund dropped the lawsuit.

On September 16, 2004, after the CBA terminated under IES's notice and after an IES employee complained to the Union about his insurance, Tommy Thomas, the Union's Business Representative and Director of Organizing, told the project manager of IES's Patrick Henry Middle School worksite that IES was not paying fringe benefits. That day IES sent the Fund IES's June and July 2004 payroll report, two checks totaling $56,000, and a letter explaining that these monies were "being submitted in accordance to our Agreement dated May 21, 2004," the date IES, TLG, and the Union settled the NLRB charge, but that "these payments in no way reflect a desire to continue a contract or to extend the contract as per our letter dated March 23, 2004," the date IES purported to terminate the CBA. In December 2004, after another employee complained to the Union about his insurance, Thomas told the project manager at IES's Western Michigan University worksite that IES was not paying fringe benefits. That month the Union notified the Fund that IES had not paid fringe benefits, and the Union requested a comprehensive audit of IES.

In the present suit, the Fund alleges that TLG, as IES's alter ego, is bound by the CBA and that defendants[1] must pay delinquent fringe benefits and liquidated damages for all CBA-covered work performed or subcontracted by either firm before the CBA's termination. IES and TLG impleaded the Union. IES claimed that the Union's ordering of comprehensive audits constituted discrimination under 42 U.S.C. § 1981 because the Union had not ordered audits of non-Hispanic companies with similar business practices. IES asserted defamation claims based on Thomas' statements to the project managers at Patrick Henry Middle School and Western Michigan University that IES was not paying fringe benefits. TLG asserted a defamation claim against the Union based on the picketing of a TLG worksite in July and August 2003. IES also sought restitution for overpayment of fringe benefits for periods following termination of the CBA. The district court denied cross-motions for summary judgment as to these claims and held a four-day bench trial.

At trial, Mr. and Mrs. Llamas testified that IES and TLG had separate equipment, office supplies, phone numbers, bank accounts, lines of credit, corporate records, and tax accounts. They also testified that the two firms had different business purposes—IES was largely a painting firm focusing on public sector work, and TLG was a general contractor focusing on private sector work. They also testified, however, that IES and TLG had at times loaned each other money, and had shared some projects, some employees, and an office building for which TLG paid IES rent and a management fee for services including upkeep and snow removal. In 2003, TLG paid IES a

---

[1]Mr. Llamas, as CBA guarantor, is also a defendant in the case and was found jointly and severally liable for delinquent fringe benefits and liquidated damages. He raises no separate claims.

$106,254 management fee and $71,200 for equipment rental. Mr. Llamas testified that TLG wrote

IES twelve checks totaling over $400,000 for unspecified reasons. Though Mrs. Llamas owned TLG

and Mr. Llamas owned IES, both Mr. and Mrs. Llamas acknowledged having some authority over

both firms' finances and receiving money from each firm until 2003. The Fund's auditor testified

that numerous monetary transfers between IES and TLG were identified as "accounts payable-trade,"

a term usually indicating an undocumented loan repayment or a subcontracting payment. The auditor

also testified that Mr. and Mrs. Llamas appeared on the payroll of both IES and TLG until 2003.

In connection with IES's discrimination claim, Nikitas Balatzis, owner of a non-Union

painting company, testified that the Union had seldom contacted him during his first ten years in

business, and that, after he hired Hispanic workers, contact from the Union increased and he received

a "barrage" of prevailing wage complaints. Robert Kennedy, the Union's business manager,

acknowledged that Mr. Llamas had previously notified the Union that other Union painting

contractors had related non-Union companies that gave them a competitive advantage over IES.

Other Union contractors testified that they had related non-Union companies but the Union had not

ordered comprehensive audits of their companies. These other contractors also testified that, to their

knowledge, Union employees had not grieved their payment practices.

Kennedy testified that IES had placed a Union steward at the Patrick Henry Middle School

worksite, a project IES started after the CBA's official termination date. Kennedy also testified that

Union members working at that site complained to the Union that IES was not paying fringe benefits,

and that when Kennedy approached Mr. Llamas about those complaints, Mr. Llamas stated that he

would pay the benefits when the project's general contractor paid IES. Kennedy testified that Mr.

Llamas told him for the first time in December 2004 that IES would not remain a Union contractor

and that Kennedy had requested a comprehensive audit of IES then because IES's decision had upset

him. Thomas testified that he had believed in September 2004 that IES would remain a Union

contractor despite IES's official termination of the CBA and failure to sign another Union contract.

Kennedy indicated that other firms sent similar official termination notices but remained Union

contractors after further negotiation. (This testimony, if accurate, substantially affects many issues

in this case. It supports the Fund's and the Union's arguments that a notice of CBA termination was

generally considered a technicality and not a true indication of the intention to go non-Union.)

In connection with IES's restitution claim, Mr. Llamas testified that he paid the June and July

2004 fringe benefits because the Union had shut down the Patrick Henry Middle School worksite

in September 2004 and he wanted to enable his workers to return to work and finish the project. Mr.

Llamas testified that he told Thomas in September 2004 that he felt these payments were extortion.

The Fund's auditor testified that the June and July 2004 fringe benefit payments could not be used

to offset the amount that IES would owe in this suit because IES did not pay those benefits in error.

By contrast, the auditor testified that his estimate did provide offset for overpayments that occurred

when IES erroneously paid fringe benefits for more hours than a particular painter had worked.

The district court found that IES and TLG were alter egos partially based on their operations:

> IES and TLG (1) have substantial undocumented/inaccurate inter-company
> transactions and financial records; (2) Mr. Llamas can sign checks for TLG, and Ms.
> Llamas can sign checks for IES; (3) Mr. Llamas appears on the payroll of TLG and
> Ms. Llamas appears on the payroll of IES; (4) Mr. Llamas has sometimes supervised

> TLG projects; [and] (5) IES takes care of many of the bills and maintenance for the building for an arbitrary management fee . . . .

The court also found that IES and TLG's finances were "pervasively intermingl[ed]," that IES and TLG's ownership and management, though technically different, were "not as [different] as would usually be the case between two distinct companies," and that their business purposes were "generally separate" but not " mutually exclusive." The district court therefore concluded that defendants were jointly and severally liable for delinquent fringe benefits and liquidated damages. The fringe benefit contribution amount is based on (1) hours worked by Union painters on both IES and TLG payrolls while the CBA was in effect and (2) the hours worked by non-Union painters who worked only for TLG while the CBA was in effect.

The district court found that IES's § 1981 discrimination claim failed because the Union would have ordered comprehensive audits of IES, regardless of IES's Hispanic ownership, due to employee complaints about IES's failure to pay fringe benefits. The district court found that the Union had not ordered comprehensive audits of other firms because their employees did not complain about their wages and the Union does not aggressively enforce the CBA without employee complaints. The district court concluded that IES's defamation claims—based on Thomas' statements at Patrick Henry Middle School and Western Michigan University—and TLG's defamation claim—based on the Union's 2003 picketing—were preempted by federal labor law because the challenged statements were not made with actual malice. The district court found that IES was not entitled to restitution because it had not paid the June and July 2004 fringe benefits due to a mistake of fact or law.

**II.**

Following a bench trial, we review the district court's conclusions of law *de novo* and the district court's findings of fact for clear error. *Burzyncki v. Cohen*, 264 F.3d 611, 616 (6th Cir. 2001). Both legally and factually, there was sufficient, albeit limited, evidence that IES and TLG were alter egos, because their finances were significantly intermingled and they shared some employees, managers, and office space. "The alter ego doctrine . . . prevent[s] employers from evading obligations under the [National Labor Relations] Act merely by changing or altering their corporate form. The doctrine operates to bind an employer to a collective bargaining agreement if it is found to be an alter ego of a signatory employer." *Trs. of the Detroit Carpenters Fringe Benefit Funds v. Indus. Contracting, LLC*, 581 F.3d 313, 317-18 (6th Cir. 2009) (second insertion in original) (internal quotation marks omitted) (citation omitted). Alter ego liability attaches when "two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision, and ownership. *Id.* at 318 (internal quotation marks omitted) (citation omitted). Alter ego liability may apply to a new, non-union entity that is "merely a disguised continuance of the old [union] employer," or to a "double breasted operation" consisting of "two or more coexisting employers performing the same work [that] are in fact one business, separated only in form." *Id.* (internal quotation marks omitted).

First, the district court did not apply an incorrect legal standard for alter ego liability by balancing the relevant factors rather than determining substantial identity separately for each factor. "[T]he alter ego analysis should be flexible" and requires "a weighing of all the relevant factors,"

*NLRB v. Allcoast Transfer*, 780 F.2d 576, 581 (6th Cir. 1986), so that "no individual factor is outcome determinative," *Detroit Carpenters*, 581 F.3d at 318. Recent alter ego decisions of this and other circuits have applied a similar balancing test. *E.g.*, *id.* at 319; *Wilson v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 83 F.3d 747, 758 (6th Cir. 1996); *Trafford Distrib. Ctr. v. NLRB*, 478 F.3d 172, 179-81 (3d Cir. 2007). Therefore the district court applied the correct legal standard.

Second, the factual aspect of the district court's determination was not clearly erroneous. There was sufficient evidence for the district court to find that IES and TLG were substantially identical. The district court found that the IES and TLG's operations weighed heavily in favor of imposing alter ego liability because the companies' funds were pervasively intermingled due to numerous undocumented intercompany transfers and other payments. This finding is supported by testimony that TLG wrote IES checks for over $400,000 without a documented purpose, TLG paid IES rent and a management fee for unspecified services, and the repeated monetary transfers between IES and TLG may indicate loan or subcontracting payments. The district court found that the firms' management, ownership, and business purpose weighed slightly in favor of imposing alter ego liability because the firms' management and ownership had some overlap, and the firms' business purposes were separate but not mutually exclusive. This finding is supported by Mr. and Mrs. Llamas' testimony. Both testified that IES and TLG shared projects, employees, and an office building, and that both Mr. and Mrs. Llamas had authority over the finances of both entities. Mr. and Mrs. Llamas each appeared on the payroll of the other's firm until 2003. Mrs. Llamas testified

that, until 2004, TLG's work included painting. Therefore, while we might have reached a different conclusion if weighing the evidence independently, the district court did not clearly err when it found that, on balance, IES and TLG were substantially identical for alter ego purposes.

The NLRB settlement between IES, TLG, and the Union does not bar the Fund's alter ego claims because those parties did not agree that IES and TLG were not alter egos or that IES and TLG did not owe additional fringe benefits. Moreover, because the Fund owes its beneficiaries an independent obligation to enforce contribution requirements, the Union probably could not foreclose the Fund's ability to file suit. *See Food Employers Council, Inc.*, 293 NLRB 333, 334 n.2 (1989). Therefore, we uphold the district court's determination that IES and TLG were alter egos.

**III.**

The district court also had sufficient evidence to conclude that the Union did not violate 42 U.S.C. § 1981 when it ordered comprehensive audits of IES but not non-Hispanic Union contractors with closely related non-Union companies. The district court found that the Union would have ordered audits of IES regardless of IES's Hispanic ownership because IES employees had complained about IES's failure to pay fringe benefits and that the Union did not order comprehensive audits of other entities allegedly engaged in double breasting because it received no employee complaints about these entities. These findings are not clearly erroneous because they are supported by the testimony of Union officials and the other Union contractors.

**IV.**

IES's defamation claims fail because Thomas did not make the challenged statements—that

IES was delinquent in paying fringe benefits—with actual malice.

> When a defamation action is based on an utterance that is related to a labor-management dispute and is made in the context of that dispute . . . federal law supplants state law with respect to the degree of fault that a plaintiff must establish. *Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 64-65 (1966). Under *Linn*, a plaintiff must prove, in addition to the elements set out by state law, that the defendant published the statement in question with 'actual malice' as that term is defined in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964), and its progeny.

*Holbrook v. Harman Auto., Inc.*, 58 F.3d 222, 225 (6th Cir. 1995). Under *Sullivan*, making a

statement with actual malice means "with knowledge that it was false or with reckless disregard of

whether it was false or not." 376 U.S. at 280.

The record supports the district court's finding that Thomas did not make either statement

with knowledge of or reckless disregard for its falsehood. Thomas testified that he believed IES

would renew its Union contract after further negotiation. This belief was reasonable because other

Union contractors who initially noticed an intent to withdraw from Union contracts had renewed

those contracts after negotiation and because Mr. Llamas had indicated that IES would remain a

Union contractor by placing a Union steward on a new project and agreeing to pay fringe benefits

based on that project after the general contractor paid IES. Therefore, the IES's defamation claims

fail.[2]

---

[2]The district court also concluded that § 301 of the LMRA preempted IES's defamation claims. Because these claims fail under *Linn*, we do not consider § 301 preemption.

TLG's defamation claim also fails because the challenged statement—that TLG pays unfair wages—was not made with actual malice. The record supports the district court's finding that the Union had a reasonable belief that TLG's wages were lower than the Union rates because, when the statement was made, TLG still did painting work that otherwise would have been done by IES, and as the district court noted, there was no reason for TLG to do painting work unless it was paying lower wages than IES.

## V.

IES is not entitled to restitution for its post-CBA-termination June and July 2004 fringe benefit payments because IES did not make those payments by mistake of fact or law. Section 403(c) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, provides that "the assets of a plan shall never inure to the benefit of any employer" and permits refunds of excess contributions only when made "by a mistake of fact or law." 29 U.S.C. § 1103(c)(2)(a)(ii). This court has recognized a federal common law restitution claim for recovery of excess contributions, *Whitworth Bros. Storage Co. v. Cent. States Se. & Sw. Areas Pension Fund*, 794 F.2d 221, 236 (6th Cir. 1986), but has held that ERISA "places the determination as to whether a mistaken contribution was made in the hands of the benefit plan administrator" and the administrator's decision "is conclusive unless arbitrary or capricious, not supported by substantial evidence, or erroneous on a question of law," *Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 321 (6th Cir. 1984).

The common law right recognized in *Whitworth* is limited by the ERISA provisions permitting refunds of excess contributions only when there is a mistake of fact or law. In *Whitworth* itself we noted that "Whitworth's claim is . . . expressly limited by the terms of ERISA set out in section 403(c)(2)(A)." 794 F.2d at 236 n.24. The Ninth Circuit has read our law as so limited: "There is nothing in [*Whitworth* and similar] opinions to indicate that such a cause of action has substantive elements distinct from a section 403(c)(2)(A)(ii) [claim]." *British Motor Car Distribs., Ltd. v. S.F. Auto. Indus. Welfare Fund*, 882 F.2d 371, 377 (9th Cir. 1989). In our later opinion in *Whitworth II* we stated that "a pension fund's refusal to refund contributions paid *by mistake* is arbitrary unless retention of the money is necessary to the financial soundness of the plan or justified by some other compelling reason." 982 F.2d 1006, 1017 (6th Cir. 1993) (emphasis added); *see also Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (ruling on another ERISA provision and stating that courts have been "especially reluctant to tamper with [the] enforcement scheme embodied in the statute by extending remedies not specifically authorized by its text.") (internal quotation marks omitted) (insertion in original); *Chao v. Malkani*, 452 F.3d 290, 297 (4th Cir. 2006) (applying *Knudson*'s textually restrictive reasoning to a federal common law restitution claim). Therefore, IES cannot recover the June and July 2004 fringe benefit contributions unless these payments were made by mistake of fact or law.

As the district court found, IES did not make these payments by mistake of fact or law. Instead, Mr. Llamas's testimony indicates that he felt that allowing his workers to return to work was more important than contesting his requirement to pay the funds. Therefore, IES is not entitled to

restitution because Mr. Llamas did not make these payments by a mistake of fact or law. We need not rely on the district court's alternative holding that IES is precluded from restitution because it did not first make a formal request for a refund before filing a restitution claim.

## VI.

For the foregoing reasons, the judgment of the district court is affirmed.