NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0769n.06

No. 13-3371

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Oct 08, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| TAMMY ROSEBROUGH, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| BUCKEYE VALLEY HIGH SCHOOL, | ) | SOUTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: DAUGHTREY, McKEAGUE, and GRIFFIN, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. In this disability discrimination case, plaintiff Tammy Rosebrough appeals the district court's order of summary judgment, which dismissed all of her claims against defendant Buckeye Valley High School. Rosebrough, who is missing her left hand, alleged that Buckeye Valley discriminated against her on the basis of this disability when it prevented her from becoming employed as a bus driver for the school. This appeal is Rosebrough's second appearance before us. In an earlier decision, the district court dismissed Rosebrough's claims on summary judgment, finding that she had failed to satisfy an element of her *prima facie* burden; we reversed and remanded. On remand, the district court again granted summary judgment, finding fault with a different element of the *prima facie* case. For the reasons set out below, we affirm the judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts in this case are not in serious dispute. In our earlier decision, we summarized them as follows:

Tammy Rosebrough was born without a left hand. In September 2007, Rosebrough applied for a cook's position at Buckeye Valley North High School. Rosebrough interviewed with department supervisor Rodger Cope, who told her the school was in desperate need of bus drivers and asked if she would be interested in that position. Cope mentioned he would need to check with the State to see if there were any restrictions that would prevent Rosebrough from driving a school bus. Rosebrough said she wanted to speak with her family, then called the next day to say she was interested in the position. Cope told her he was still waiting to hear back from the State about the restriction issue. In the meantime, Cope released a memorandum to employees citing the school's need for bus drivers.

Rosebrough later called Cope to ask "what was the hold up," and Cope said again he would contact the State. A few days later, on October 3 or 4, Cope called Rosebrough to inform her that a waiver is required from the Ohio Department of Education before an individual who is missing a limb is allowed to operate a school bus and told her to come to the office to pick up the waiver forms. Rosebrough received approval of the waiver from the Department of Education several weeks later on January 23, 2008. The State rejected Rosebrough's first two waiver submissions because the first waiver's medical evaluation was completed by a physical therapist, instead of the required orthopedic surgeon or physiatrist, and the second waiver was not filled out completely. Rosebrough testified she relied on Cope's instructions and "filled out what [Cope] told me to fill out."

One or two days before Rosebrough received her waiver, Sandy Presley, a Buckeye Valley bus driver trainer, contacted Rosebrough to schedule her training, which began soon thereafter with another trainer, Deanna Carper. On February 15, Rosebrough met with Cope to discuss some issues she was having with her training. Relevant to this case, Rosebrough complained that Presley made discriminatory comments to her about her disability on two separate occasions. On February 5, Presley said Rosebrough "was going to need a lot more [training] hours . . . because of [her] arm" than another trainee who "knew the bus because he worked on cars and he was a race car driver." On February 9, in front of Carper and the other trainee, Presley told Rosebrough she "won't be able to drive bus 4 or 11 . . . because of [her] hand" since the doors on those buses are difficult to open. Presley denies making statements referencing Rosebrough's disability. Cope told Rosebrough he would speak with Presley about the comments.

Cope called Rosebrough for a follow-up meeting in his office where he said Carper and Presley told him Rosebrough was speeding, braking too fast, and not listening to instructions. Rosebrough testified Cope said "it was his trainer's responsibility to make sure that I knew what I was doing and that it was his job to fire me if I wasn't going to do the proper job." She testified Cope said she "had become high maintenance," slammed his fist down on the desk, and said "[t]he parents at Buckeye Valley will not be happy with you as a driver." Rosebrough believed Cope meant the parents would not want Rosebrough because she had a hand missing. On February 19, Rosebrough and her husband met with the superintendent, John Schiller, who said he and Cope would discuss the issue. When Rosebrough did not hear anything from Schiller for several days, she called him and he apologized for not getting back with her and said "they would be more than happy to have [her] as a driver at Buckeye Valley."

After Rosebrough resumed her training, Carper suggested she contact the State to schedule her commercial driver's license ("CDL") certification test which required Rosebrough to attend with a trainer and a school bus. Carper told Rosebrough she could come any day or time, so Rosebrough scheduled her test for March 20. On the morning of March 19, Carper called Rosebrough to say she could not attend the test because Cope had refused to let other bus drivers split Carper's bus route and she was unable to get a substitute. Rosebrough cancelled the test with the State and did not ask the State or Carper to reschedule because she "believe[d] there would never be a substitute driver" available to allow a trainer to take her to get her test "after everything they had done to me."

After canceling her test with the State, Rosebrough called Superintendent Schiller and requested her paperwork so she could finish her training and obtain her CDL elsewhere. Over the next several months, Rosebrough contacted several other testing centers and school districts but learned she could only be trained by the school district that ultimately hired her. Rosebrough never contacted Buckeye Valley again to return and finish her training.

*Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 429-30 (6th Cir. 2012).

Rosebrough subsequently filed suit against Buckeye Valley, pursuant to 42 U.S.C. § 1983, asserting claims for discrimination and disparate treatment under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Ohio Revised Code, § 4112.02 *et seq.* Buckeye Valley moved for summary judgment, attacking the sufficiency of Rosebrough's *prima*

*facie* case. The district court granted Buckeye Valley's motion, finding that Rosebrough was not "otherwise qualified" to be a school bus driver because she did not have a CDL. *Rosebrough v. Buckeye Valley High Sch.*, 2:09-CV-182, 2010 WL 3036862 (S.D. Ohio Aug. 2, 2010); *see Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 936 (6th Cir. 2000) (stating that at *prima facie* stage, ADA plaintiff must make showing that she was "otherwise qualified for [the] previous position . . . with or without reasonable accommodation"). Rosebrough appealed, and we reversed, finding that "[i]t is Rosebrough's ADA-covered position as a trainee that is at issue, and there can be no logical basis for requiring her to have a CDL to be 'otherwise qualified' for the position of training to obtain a CDL." *Rosebrough*, 690 F.3d at 433. Therefore, we concluded, "having a CDL was not necessary for Rosebrough to perform the essential functions of her training position, and the district court erred in holding otherwise." *Id.*

We remanded to permit the district court to address, in the first instance, the other elements of Rosebrough's *prima facie* case. On remand, the district court again granted summary judgment for Buckeye Valley. *Rosebrough v. Buckeye Valley High Sch.*, 2:09-CV-182, 2013 WL 633867 (S.D. Ohio Feb. 20, 2013). It found that Rosebrough had failed to establish a *prima facie* case because the record did not show any adverse action taken against Rosebrough by Buckeye Valley and that Rosebrough herself was responsible for her decision to abandon the CDL test. Rosebrough again appealed to this court.

## DISCUSSION

**Standard of Review**

We review a district court's grant of summary judgment *de novo*. *Trustees of Detroit Carpenters Fringe Benefit Funds v. Indus. Contracting, LLC*, 581 F.3d 313, 317 (6th Cir. 2009). Judgment on this basis is appropriate "if the pleadings, the discovery and the disclosure materials

on file, and any affidavits 'show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). There is "no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id.* (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In deciding the motion, "the district court must construe the evidence and draw all reasonable inferences in [Rosebrough's] favor." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008). However, "the mere existence of a scintilla of evidence in support of the non-moving party is insufficient to defeat a motion for summary judgment." *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

**Discrimination under the ADA**

Rosebrough asserts three claims under the ADA and three corresponding claims under the Ohio Revised Code: employment discrimination based on disability, employment discrimination based on perceived disability, and employment discrimination based on disparate treatment. Because disability discrimination under Ohio law is treated similarly to discrimination under the ADA, "we may review Rosebrough's state and federal claims solely under the ADA analysis." *Rosebrough*, 690 F.3d at 431.

An ADA plaintiff may show discrimination through direct or indirect evidence. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). Rosebrough offers only indirect evidence of discrimination; as a result, the burden-shifting framework of *McDonnell Douglas Corp. v. Green* applies. *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 553 (6th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Under this framework, Rosebrough must first establish a *prima facie* case of discrimination. Once she does so, the burden shifts to Buckeye Valley to present a nondiscriminatory reason for the adverse action it took against her. *Id.* If Buckeye Valley succeeds in doing so, Rosebrough must identify evidence from which a reasonable jury could conclude that Buckeye Valley's proffered non-discriminatory reason is pretextual. *Id.* At the *prima facie* stage, Rosebrough's burden is not onerous. *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 317 (6th Cir. 2012) (*en banc*).

The elements of Rosebrough's three ADA claims largely overlap. In order to establish a *prima facie* case of disability-based discrimination under the ADA, Rosebrough must show that she is disabled but is otherwise qualified for the position, with or without reasonable accommodation; that she suffered an adverse employment decision; that the employer knew or had reason to know of the plaintiff's disability; and either that the position remained open while the employer sought other applicants or the disabled individual was replaced. *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996), *abrogated on other grounds by Lewis*, 681 F.3d at 317. A perceived disability claim applies essentially the same *prima facie* test, except that a nondisabled plaintiff may satisfy the first element by showing that she was perceived to be and treated as if she were disabled. *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 318 (6th Cir. 2001). Likewise, we review a claim for disparate treatment using this same framework, except that "the plaintiff can satisfy the fifth element of the prima facie case by showing that similarly situated non-disabled employees were treated more favorably."

*Rosebrough*, 690 F.3d at 431 n.2 (citing *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1999)).

The district court initially granted summary judgment for Buckeye Valley on the second element—finding that Rosebrough was not "otherwise qualified for the position" of bus driver because she did not have a CDL. After our reversal and remand, Buckeye Valley argued that Rosebrough had failed to satisfy the first and third elements of her prima facie test—a showing of disability and of adverse action by the employer. The district court assumed without deciding that Rosebrough was disabled, but found summary judgment appropriate on the basis that Rosebrough had not "suffered an adverse employment decision." *Rosebrough*, 2013 WL 633867, at **5-6. We agree.

To show an "adverse employment action," an ADA plaintiff must point to a negatively impactful employment decision by Buckeye Valley regarding "hiring, advancement, or discharge[,] . . . compensation, job training, and other terms, conditions, and privileges of employment," 42 U.S.C. § 12112(a), or any other "materially adverse change in the terms of [ ] employment." *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (*en banc*) (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)). Although "adverse employment action" thus enjoys a very broad definition, it is not without limits. For example, "[a] 'mere inconvenience' . . . or a 'bruised ego' is not enough to constitute an adverse employment action," *White*, 364 F.3d at 797 (quoting *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir. 1989)), and a plaintiff does not satisfy this element unless she can show that her disability (or perceived disability) was the "but-for" cause of the employment decision. *Lewis*, 681 F.3d at 318.

Rosebrough points to several sources of indirect evidence that she claims, taken together, demonstrate adverse action by Buckeye Valley. Principally, she complains that beginning with Cope's initial invitation to apply for the bus driver position, it took seven months for her to complete her training and qualify for the CDL examination. This length of time—combined with other characteristics of her training experience—leads Rosebrough to conclude that Buckeye Valley never really wanted her to obtain the CDL or gain employment as a bus driver in the first place.

The seven-month delay Rosebrough identifies is, in turn, composed of two distinct sub-phases. First, there is the four-month period Rosebrough was required to wait before beginning bus-driver training (a delay occasioned by the Department of Education's 'waiver' requirement for limbless drivers). Second, Rosebrough objects to the length and conditions of the training period itself.

Beginning with the pre-training delays, we find no record evidence to support Rosebrough's claim of adverse action during this period, that is, evidence that Buckeye Valley obstructed her efforts to begin bus driver training or obtain a disability waiver from the Ohio Department of Education. In fact, Rosebrough appears to abandon this argument, stating in her reply brief: "Appellant's litigation is about being denied the opportunity to test for her CDL, not that she was denied becoming a trainee."

Even if not abandoned, however, the claim fails. The Ohio Department of Education, not Buckeye Valley, had responsibility for the waiver process, *see* Ohio Admin. Code 3301-83-07 (2012), and most of the delays Rosebrough experienced were the result of her own actions, such as seeking a medical opinion from an unauthorized provider and omitting required information from the waiver form. Although she attempts to blame Cope for these mistakes and omissions,

Rosebrough's deposition testimony indicates that Cope played a minimal role in the waiver process beyond providing the initial forms and directing Rosebrough's questions to the Department of Education. Rosebrough also concedes that she did not read the waiver form when filling it out. As a result, the delay in obtaining a waiver and beginning training cannot be causally linked to Buckeye Valley and, thus, fails to constitute an adverse employment action under *Lewis's* "but-for" causation standard. 681 F.3d at 318.

Rosebrough directs more attention to Buckeye Valley's actions *during* the training period—actions she claims interfered with her training and prevented her from testing for her CDL. Here, too, we conclude that Rosebrough has failed to make out a *prima facie* case of discrimination, because the record contains no factual basis for an inference that Buckeye Valley took action to prevent Rosebrough from testing for the CDL. Instead, the record indicates that after recruiting and training Rosebrough for the position of bus driver, Buckeye Valley was prepared to reschedule the CDL exam at her convenience and to hire her if she passed. That the CDL test never occurred is, again, traceable only to Rosebrough's actions—namely, her decision not to reschedule the test, despite her trainer's invitation to do so. As a result, Rosebrough's abandonment of the CDL test cannot be attributed to Buckeye Valley and thus does not satisfy the adverse action element of her *prima facie* case.

Rosebrough makes several arguments to the contrary, none of which we find persuasive.

First, Rosebrough contends that her training took longer than that of a non-disabled fellow-trainee, and that this supports an inference of unequal treatment. We do not find that this raises a triable fact question, however, because this trainee was both an auto-mechanic and an amateur race-car driver. He therefore had substantially greater driving and automotive experience than Rosebrough, and comparing his experience to Rosebrough's would be a case of

apples to oranges. Moreover, their difference in training time was only modest: Rosebrough's training occurred on nine separate dates spread across an eight week period; the mechanic/race car driver's training occurred on seven dates over a five week period.

Second, Rosebrough points to various clerical errors contained in her daily training sheets. She asserts that these errors reveal such sloppiness on the part of her trainers as to support an inference that they intended for her training to fail. This claim is rebutted, however, by the fact that she *did* succeed in completing training and, in fact, *was* qualified to take the CDL test. Once training was completed, only one form (known as a T-9 form) was required as proof of Rosebrough's qualification to take her CDL exam and, at that point, any error in the daily training logs became immaterial. Nor is it probative that Rosebrough's T-9 form remained partially incomplete at the time she abandoned her efforts to obtain a CDL; Carper testified that she was in the process of completing the T-9 when Rosebrough demanded that the form—and her other training materials—be returned to her.

Next, Rosebrough directs us to Presley's hurtful comments about her missing hand—comments made during Rosebrough's February 5 and 9 training sessions—-as evidence of Buckeye Valley's hostility towards her. Taking the record in the light most favorable to Rosebrough, we agree that Presley's comments showed a lack of sensitivity about Rosebrough's disability. We disagree, however, that this raises a triable issue of fact regarding disability discrimination. Carper, not Presley, was the trainer primarily responsible for Rosebrough's training, and Rosebrough does not allege (and the record does not show) that Carper ever made insensitive comments about Rosebrough's disability. Furthermore, once Rosebrough completed her training and received clearance to take the CDL test, whatever ill-will existed between her

and Presley was of no further relevance to Rosebrough's ability to obtain the required license and become a driver.

Finally, Rosebrough argues that Buckeye Valley "told [her] she would be tested when her trainer knew it was not possible due to the lack of substitute drivers" and that this deception evidences Buckeye Valley's intent that the testing never occur. In our view, the record does not support such an inference. When, on March 14, Carper and Rosebrough scheduled the CDL test, Carper could not have foreseen what the staffing situation would be a week later, on March 20. Despite a general shortage of bus drivers within the district (the same shortage that led to Rosebrough's recruitment), Carper and Cope had apparently been successful in finding substitute drivers on short notice in the past, and it is therefore not the case that Carper "knew" that the March 20 exam date was impossible at the time she scheduled it. Rosebrough also casts blame on Cope for preventing Carper from "splitting" her route so as to accommodate the exam, but Rosebrough points to no evidence that anything other than the undisputed driver shortage was to blame for Cope's decision. That decision, which prioritized transporting children to school over accommodating Rosebrough's exam, strikes us as eminently reasonable. Additionally, it is undisputed that Carper not only suggested rescheduling the CDL test, but proposed alternative times when the shortage of bus drivers would not cause interference, such as on a weekend or afternoon. Far from betraying the intention of thwarting Rosebrough's CDL test, Carper's suggestions indicate a desire to see the test occur promptly.

In short, the record contains no facts suggesting an effort by Buckeye Valley to obstruct Rosebrough from taking her CDL exam or becoming a bus driver. On the contrary, it shows that Buckeye Valley was ready and willing to assist her in taking the exam, if only she had rescheduled for a time when spare drivers and buses were available. Rosebrough has thus failed

to show that Buckeye Valley took an adverse action against her, a shortcoming that is fatal to each of her ADA claims, as well as her corresponding claims under the Ohio Revised Code.

## CONCLUSION

For the reasons set out above, the judgment of the district court is AFFIRMED.