NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0614n.06

No. 18-3397

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ALISON O'DONNELL, | ) | **FILED** |
| | ) | Oct 29, 2020 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| UNIVERSITY HOSPITALS CLEVELAND | ) | UNITED STATES DISTRICT |
| MEDICAL CENTER, aka University Hospitals | ) | COURT FOR THE |
| Health Systems; NAVEEN ULI; SUMANA | ) | NORTHERN DISTRICT OF |
| NARASIMHAN; and ROSE GUBITOSI-KLUG, | ) | OHIO |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

Before: BOGGS, KETHLEDGE, and STRANCH, Circuit Judges.

BOGGS, J., delivered the opinion of the court in which KETHLEDGE and STRANCH, JJ., joined. STRANCH, J. (pp. 26–27), delivered a separate concurring opinion.

BOGGS, Circuit Judge. Like many people, Dr. Alison O'Donnell disliked public speaking. In her case, this was not just a matter of preference. Her anxiety disorder made it very difficult. This became a problem when University Hospitals Cleveland Medical Center (the Hospital) hired her as a Fellow in pediatric endocrinology. The fellowship required her to attend and participate in weekly presentations and discussions with faculty about practice and research topics. She was unable to do this adequately and the Hospital eventually placed her on indefinite leave. She resigned, never returning to the program. In this suit under the Americans with Disabilities Act and corresponding Ohio state law, Dr. O'Donnell alleges that the Hospital and her faculty supervisors discriminated against her because of her anxiety disorder, failed to accommodate her

disability, and retaliated against her after she complained. For the reasons given below, especially because active participation in the weekly presentations was an essential function of her job, we affirm the district court's grant of summary judgement to the Hospital and the individual defendants.

**I.**

O'Donnell raises a number of claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112 et seq. However, all of them except one are barred by the statute of limitations. As required by the ADA, she initially filed a charge with the Equal Employment Opportunity Commission ( EEOC) when she was placed on unpaid leave. However, she did not file her lawsuit until 304 days after filing with the EEOC and thus all of the claims relating to events prior to that filing were untimely. Her complaint alleges constructive discharge based on her resignation from the program on December 16, 2012, which was within the statutory 300-day period and was timely filed. Her analogous state-law claims, however, are governed by the state six-year statute of limitations, Ohio R. Code § 2305.7, and thus are not barred. Those claims are, as based on various parts of Ohio R. Code § 4112(A)-(I): disability discrimination, refusal to accommodate, failure to engage in an interactive process, and retaliation for protected activity.

Dr. O'Donnell's state-law claims all grow out of her activities at, and termination from, the University Hospital Pediatric Endocrinology Fellowship program. The claims arise from her view that her treatment was related to her perceived unwillingness or inability to participate actively and fully in weekly conferences that were part of the routine activities of the Fellows at the Hospital. She alleges that any deficiencies in her performance stem from her disability, and that all of the harms done to her stemmed from the actions of the Hospital and the other defendants in violation of her rights under statutes protecting those with a disability.

The pediatric fellowship program is not a conventional "job" as usually appears in this type of litigation. It is a specialized, highly prestigious program, usually lasting three years, which only accepts two applicants each year. Fellows are expected to be progressing toward careers in clinical practice and research, obtaining board certification in pediatrics, and otherwise becoming qualified to be leaders in the profession.

Dr. O'Donnell was not performing well in the program. She had bad evaluations at the end of her first year. She believed that some of these problems were based on her having a disability of anxiety disorder, and of discrimination against her on this account. She ultimately formally requested an accommodation for her disability, that she not be evaluated on her performance at weekly meetings that included prepared Fellow presentations, but then progressed to group discussion of the presentations and of patient and other medical issues, in an unrehearsed manner.

The Hospital deemed this request unreasonable, as active participation in the weekly conferences was an essential part of the fellowship program, allowing evaluation of Fellows' progress in knowledge, medical and patient care skills, and research ability. Although the request was supported by a doctor's analysis that the disability was permanent, the doctor also included a strong statement that Dr. O'Donnell was seeking to overcome the disability and was making progress.

The Hospital therefore proposed, as an alternative to ceasing to evaluate Dr. O'Donnell on this aspect, that her fellowship program be extended for one year, at first just to make better progress, and then, as an accommodation, giving her an unpaid leave of absence and health benefits during that period, so as to give her an opportunity to overcome her disability and rejoin the program. She rejected this proffered accommodation.

She was placed on unpaid leave on July 1, 2012, and for the next six months had no contact with the program, sought no additional medical help, and sought other employment. In December 2012, she appeared to have secured other employment, which required her to terminate her fellowship, which she did on December 16, 2012. Unfortunately, the job fell through, and five months later she sued the Hospital.

Though the claims under the Ohio disability-discrimination statute, Ohio R. Code § 4112 et seq., are several, they are largely controlled by a common set of questions, in various combinations. To defeat summary judgment on each issue, plaintiff need only show that there is a genuine issue of material fact on a point that, if decided in her favor, would sustain her claim.

1. Is active participation in the weekly conferences, and being evaluated on performance in them, an essential part of the Fellowship program? If yes, this prevents her from being "qualified to do the job," as she admits, with her doctor's support, that she cannot do so, unless she can demand and receive a "reasonable accommodation."

2. Is not being evaluated a reasonable accommodation? If the requested accommodation removes an essential feature of the job, it is not reasonable and thus defeats several of her claims.

3. Dr. O'Donnell is also entitled to a reasonable interactive process on her request for accommodation. 29 C.F.R. § 1630.2(o)(3). The Hospital offered her a twelve-month leave of absence to allow her the opportunity to be able to rejoin the program and perform its essential functions. She refused this offer, offering instead to take a six-month leave, but she made no further requests. If the Hospital performed enough interaction with Dr. O'Donnell in the accommodation process, this defeats her claim on this point.

4. Dr. O'Donnell claims discrimination based on her disability, relying on a series of workplace events that she claims shows disparate treatment between her and other Fellows. Were these actions linked to her alleged disability and were they sufficient to constitute, singly or in combination, an adverse action?

5. Dr. O'Donnell claims retaliation by the Hospital in her treatment after her requests for accommodation, in that she had received a bad evaluation (a "Performance Alert"), shortly after an informal request concerning her evaluations, which was similar in a number of respects to evaluations she had received earlier in her fellowship. Has she established a causal relation between her protected activities and the actions of the Hospital and the individual defendants?

6. Did her involuntary leave of absence constitute a constructive discharge? Was she actually discharged and, if she was, was the discharge justified by her inability to perform the essential features of the job? If the Hospital discharged her in good faith and without pretext, then the discharge is not actionable.

## II.

Dr. O'Donnell is an African-American physician who, after completing medical school and a residency program, was selected to participate in the prestigious Pediatric Endocrinology Fellowship program at University Hospitals Case Medical Center, an Appellee in this case. The three-year fellowship program accepts only two applicants every year and is run by seven Hospital faculty members, including fellowship director Dr. Naveen Uli. The program trains fellows for academic-related careers in pediatric endocrinology and to become board-certified pediatric endocrinologists. To complete the program, fellows must successfully meet clinical and research-based requirements, which track national standards.

As part of the fellowship, Fellows, faculty, and several members of the nursing staff participate in weekly two-hour Wednesday afternoon meetings.  At these meetings, high-level pediatric endocrinology cases are analyzed, and the group analysis provides the faculty with the ability to determine the skill level of the Fellows.  Specifically, a Fellow presents a prepared case study and then other Fellows are called upon to answer questions and/or give unprepared presentations on the case.  There is then general discussion on the various presentations and on the cases being analyzed.  In addition, every Fellow must complete a research project to complete the program successfully.

Dr. O'Donnell was accepted into the fellowship program on June 25, 2009.  Her three-year fellowship commenced on June 1, 2010.  On July 2, 2009, Dr. O'Donnell was diagnosed with social-anxiety disorder and social phobia by Dr. Francoise Adan, her psychiatrist.  Dr. O'Donnell was treated by Dr. Adan from July 2009 through January 2013 and prescribed the medications Lexapro (anti-depressant) and Klonopin (anti-anxiety).  Dr. Adan stated that Dr. O'Donnell experienced "physical symptoms of anxiety around social situations, heart racing, sweating, speaking fast, poor concentration, mind going blank and jittery" which affected both her personal and professional life.

In 2009, Dr. O'Donnell also entered into counseling with Dr. Paul Minnillo, a Hospital psychologist.  She continued to see Dr. Minnillo through May 2011.  Dr. Minnillo testified that Dr. O'Donnell's anxiety disorder was "very pervasive, very profound."  He described her disability as "debilitating," "disabling," and "life-long."  As result of her social-anxiety disorder, Dr. O'Donnell had trouble participating and speaking at the mandatory Wednesday meetings.

Dr. O'Donnell alleges in her complaint that she told Dr. Uli "early in my fellowship" that she suffered from a social-anxiety disorder.[1] After her disclosure, she claims that Dr. Uli and several other fellowship faculty discriminated against her and subjected her to disparate treatment compared to the other Fellows because of her disability. Her complaints included that she received less time for orientation than other Fellows; she was assigned a presentation without preparation time; she was forced to see patients who were over an hour late despite clinic protocol to have such patients reschedule; Dr. Narasimhan unprofessionally referred to her by first name in front of patients; Dr. Narasimhan tried to coerce Dr. O'Donnell to see Narasimhan's clinic patients; she was given clinical assignments with less notice than other Fellows; she was required to directly reschedule patient appointments; she was criticized for not writing patient notes or charts in a timely or thorough manner; and her research project ideas were rejected and she was advised to work with another Fellow on that Fellow's project.

At the end of her first year, Dr. O'Donnell received poor evaluations from every faculty member in the program. These evaluations addressed many issues, including inadequate participation in, and poor performance at, the Wednesday meetings. They also included evaluations by each faculty member, finding her well below her peers on each of the items, as well as her performance on written tests of knowledge where her scores were also well below her peers in the program. On June 29, 2011, she was issued a Remediation Plan for performance deficiencies that included inadequate progress in developing clinical knowledge and skills, poor performance on a written examination, poor topic presentation at Wednesday meetings, and failure to finalize her research project. Dr. O'Donnell attributes these poor reviews to discrimination.

---

[1] Dr. Uli testified on deposition that Dr. O'Donnell had never told him that she was diagnosed with an anxiety disorder. She had mentioned that it was "her family and cultural upbringing that prevented her from speaking out of turn, and her innate shyness and social anxiety."

In the middle of her second year, on February 12, 2012, for reasons that do not appear in the record, Dr. O'Donnell sent an email to all seven Fellowship-faculty members regarding her performance at Wednesday meetings:

> It has come to my attention that many of you wish for me to speak more during Wednesday conferences, and are interpreting my silence as ignorance. However, my culture/religion, learning style, shyness, and anxiety make it extremely difficult for me to just shout out answers. Therefore, I invite you to ask me questions. In addition, I plan to make more than the required number of presentations. (I have a very interesting topic that I am excited to present on 2/22). Hopefully, this is a compromise that will suit everybody's needs. I believe that a training program should take into account a variety of learning styles-not everybody learns the same way. If you have any other suggestions as to how we can work to solve this issue, please let me know.

This email did not invoke any disability law, and simply "invited" faculty to ask her questions. Her invitation was not a formal request for accommodation and was not accompanied by any of the standard ADA claim paperwork or supporting medical documentation. Nor did it seek any formal agreement to her wishes or change in her method of evaluation.

In February 2012, Dr. O'Donnell received a Performance Alert Notice, her second official warning for marginal or unsatisfactory performance. Based on these ongoing performance problems, the faculty had concluded at a meeting on February 22 that Dr. O'Donnell was not performing at the level expected of a second-year Fellow and recommended that her fellowship be extended for an additional year to give Dr. O'Donnell time to develop the mandatory core competencies for pediatric endocrinology. On February 29, Dr. Uli met with Dr. O'Donnell to discuss the Performance Alert and her fellowship status. She refused to sign the Performance Alert and stated she would consider extending her fellowship for an extra six months, but not twelve.

Subsequently, on March 20, 2012, Dr. O'Donnell filed a formal ADA disability complaint and a request for accommodation with the Hospital. To support that request, her psychiatrist, Dr. Adan, completed on May 3, after several promptings, an ADA Health Care Provider/Physician

Certification Form. Question 3 on the form asks, "Does the disability affect the employee's ability to perform any one of the essential functions of the position?" Dr. Adan checked the yes box, and hand-wrote that the effect on her ability to perform a specific essential function was "Public speaking at case conference, specially un-rehearsed." Question 4 asks if there are any accommodations that would allow Dr. O'Donnell to perform the essential function. Dr. Adan checked the yes box and wrote "I would recommend not to evaluate employee performance on case conferences, particularly un-rehearsed." Dr. Adan also said that Dr. O'Donnell's need for the accommodation would be permanent during the rest of the fellowship.

In a letter dated June 14, 2012, the Hospital denied Dr. O'Donnell's request for such accommodation on grounds that active participation in the Wednesday meetings was an essential function of her position. The letter stated that she would be placed on unpaid, involuntary leave effective July 1, 2012. Her health care benefits were continued during this period. Dr. O'Donnell never returned to the fellowship program and officially tendered her resignation on December 16, 2012.

To follow the course of events, the following summary timeline may be helpful.

| | |
|---|---|
| June 2010 | Three-year fellowship begins. |
| June 2011 | First-year evaluations of the Fellows. All seven faculty members rated Dr. O'Donnell's performance "below the level expected." |
| June 29, 2011 | First formal warning for poor performance, a Remediation Plan, given to Dr. O'Donnell by Dr. Uli. |
| February 12, 2012 | Dr. O'Donnell sent an email to all seven faculty members regarding her performance at Wednesday meetings. |
| February 22, 2012 | Faculty meeting on Dr. O'Donnell's progress in the program. |
| February 29, 2012 | A second written warning of poor performance, a Performance Alert Notice, was given to Dr. O'Donnell and Dr. O'Donnell met with Dr. Uli about this notice. |
| March 20, 2012 | Dr. O'Donnell submitted a formal request for disability accommodation with the Hospital. |

| | |
|---|---|
| March 21, 2012 | The Hospital asked Dr. Uli to provide a job description and the essential job functions for a Fellow in the pediatric endocrinology program. |
| March 22, 2012 | Dr. Uli provides a 12-point list, based on document he had prepared in 2011. |
| March 22, 2012 | ADA medical form was sent to Dr. O'Donnell's psychiatrist, Dr. Adan, with respect to the request. |
| May 3, 2012 | Dr. Adan sent the Hospital an ADA Physician Certification Form, stating that Dr. O'Donnell's disability affected an essential function of her job, which could be overcome with a reasonable accommodation. |
| June 14, 2012 | The Hospital denied Dr. O'Donnell's accommodation request and placed her on a mandatory leave of absence starting July 1, 2012. |
| July 1, 2012 | Dr. O'Donnell began her involuntary leave of absence. She never returned to the fellowship program. |
| May 1, 2013 | Dr. O'Donnell filed complaint with the EEOC. (304 days after July 1, 2012). |

## III.

On October 10, 2016, Dr. O'Donnell filed suit against the Hospital, Dr. Navenn Uli, Dr. Sumana Narasimhan, Dr. Rose Gubitosi-Klug, and William Rebello,[2] alleging claims of disability discrimination, failure to accommodate, and retaliation based on disability discrimination in violation of the ADA, 42 U.S.C. § 12112, and Ohio R. Code § 4112.[3] The Hospital and the individual doctors filed for summary judgment. The district court granted defendants summary judgment, agreeing that O'Donnell was disabled, but holding that there was no genuine issue of material fact that O'Donnell was not otherwise qualified for her position, that she did not suffer any adverse action, and that the Hospital's proffered reasons for its actions were legitimate non-discriminatory reasons that were not pretextual.

Specifically, the district court held that there was no genuine issue of material fact that Dr. O'Donnell's accommodation request was not reasonable. Her doctor had stated that she could not

---

[2] Both parties stipulated to the dismissal of all claims against Rebello. The three remaining individual defendants are the chair and two other members of the seven-member faculty of the program.

[3] Dr. O'Donnell also brought federal race-discrimination claims under Title VII. The district court ruled against her and she did not appeal the dismissal of those claims.

perform an essential function of the job (adequate participation in Wednesday meetings) and thus that her requested accommodation (no evaluation based on her performance in Wednesday meetings) effectively removed an essential function of a Fellow's job. The district court held that such an accommodation was unreasonable and created an undue hardship on the Hospital.

## IV. Standard of Review

Dr. O'Donnell timely appealed the district court's grant of summary judgment. We review that ruling de novo. *Kleiber v. Honda of Am. Mfg., Inc*., 485 F.3d 862, 868 (6th Cir. 2007). Summary judgment is appropriate when the court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that there are no genuine issues of material fact. The non-moving party must then come forward with specific facts showing a genuine issue for trial. A court must review all facts and inferences in a light most favorable to the non-moving party. *Hall v. Spencer County, Ky*., 583 F.3d 930, 933 (6th Cir. 2009). This means in most cases that evidence offered by the non-movant must be accepted at true and that credibility determinations and weighing of the evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 854 (6th Cir. 2018).

## V. Statute of Limitations

As an initial matter, the Hospital argues that Dr. O'Donnell's ADA claims are barred by the statute of limitations. She had 300 days to file her ADA claims with the EEOC. *See* 42 U.S.C. §§ 2000e-5(e)(1), 12117(a). She complied with this requirement for her constructive-discharge claim, which accrued when she resigned on December 16, 2012. But she filed her other ADA claims too late. The Hospital's last alleged discriminatory act occurred on July 1, 2012, when Dr. O'Donnell's involuntary leave of absence commenced. She filed her EEOC charge on May 1,

2013, more than 300 days later. Dr. O'Donnell argues that under the continuing-violation doctrine, the clock should have started running on December 16 for *all* of her claims, not just the alleged constructive discharge. This is incorrect. The continuing-violation doctrine only applies in hostile-work-environment cases, as "[t]heir very nature involves repeated conduct" where the claim is "based on the cumulative effect of all such acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). In cases that do not involve a hostile-work-environment claim, each "discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore must be filed within the" applicable limitations period "after the discrete discriminatory act occurred." *Id.* at 113. Dr. O'Donnell failed to timely file her ADA claims (other than constructive discharge) with the EEOC within 300 days of the alleged discriminatory acts. Thus, her constructive-discharge claim is her only timely federal claim.

However, Dr. O'Donnell's state-law claims under Ohio R. Code § 4112.02 have a six-year limitations period, and they remain viable. Ohio R. Code § 2305.7. Ohio's state-law disability claims rise or fall with an employee's ADA claims. "[W]e consider the ADA and [Ohio] state law claims simultaneously by looking to the cases and regulations that interpret the ADA." *Rorrer v. City of Stow*, 743 F.3d 1025, 1031 (6th Cir. 2014) (citing *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 n.3 (6th Cir. 2008)). We will do the same here, using the ADA statutory framework and case law to analyze Ohio claims. *See Brenneman v. MedCentral Health System*, 366 F.3d 412, 418 (6th Cir. 2004).

## VI. Disability-Discrimination Claims

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of a disability." 42 U.S.C. § 12112(a). The statute defines "discriminate" to include "not making reasonable accommodation to the known physical or mental limitations of an

otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship."  42 U.S.C. § 12112(b)(5)(A).  An "otherwise qualified individual" is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C.§ 12111(8).

Courts analyze disability-discrimination claims under two different rubrics, depending on whether the plaintiff relies on "direct" or "indirect" evidence of discrimination.  *See Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891–92 (6th Cir. 2016). Failure of accommodate and failure to engage in an  interactive process,  along with  constructive discharge (in this case) are evaluated under the direct-evidence standard, while disparate treatment and retaliation are evaluated on an indirect-evidence standard.

## A.  Failure to Accommodate

To prove failure to accommodate under the direct-evidence framework, a plaintiff must show that: 1) she is disabled within the meaning of the ADA; 2) she is otherwise qualified for the position and could perform the essential functions of the job, with or without reasonable accommodation; 3) her employer knew or had reason to know about her disability; 4) she requested an accommodation; and 5) her employer failed to provide the requested  accommodation.  Once a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer.  *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018).

It is not disputed that Dr. O'Donnell can satisfy elements three, four, and five.  As for element one, Dr. O'Donnell must show she is disabled.  Relying on the medical opinions of Dr. O'Donnell's treating psychiatrist, Dr. Adan, and treating psychologist, Dr. Minnillo, the district

court held that Dr. O'Donnell's social-anxiety disorder is a qualifying disability under the ADA that substantially limits one or more of her major life activities.

A major life activity can be something considerably less than a total loss of function in some area. A significant diminution in the ability to carry out some function usually performed by most people can be considered major. *See* 29 C.F.R. § 1630.2(j)(1); *Talley*, 542 F.3d at 1107. In this case the medical support indicates that Dr. O'Donnell's anxiety disorder does substantially limit her ability in speaking, so as to participate in the normal interaction of professional occupations such as medicine where such interaction is a common occurrence. The Hospital, while maintaining that Dr. O'Donnell is not disabled, provides no medical evidence to challenge the medical opinions of Dr. O'Donnell's treating physicians. Lacking any evidence to the contrary, the district court correctly held that Dr. O'Donnell's social-anxiety disorder is a qualifying disability.

The second element is where the case now turns. Dr. O'Donnell must prove that she is otherwise qualified for the position and could perform the essential functions of the job, with or without reasonable accommodation. "The term essential functions means the fundamental job duties of the employment position . . . . [It] does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors. Two of these factors are the employer's written description of the job and the employer's judgment as to what functions of a job are essential. In determining whether an individual can perform an essential function "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C § 12111(8). The Hospital does not have a formal job description for a Fellow, as it might for a

conventional employment relationship. The Hospital produced on discovery a written document entitled "Expectations of Fellows," which Dr. Uli prepared in 2011 and updated in 2012. This lists participation in Wednesday meetings as an essential function. A second document, entitled "Pediatric Endocrinology Fellowship Goals," contains a number of academic, research, and clinical items, and was given to Dr. O'Donnell during her 2010 orientation and does not mention the Wednesday meetings as a "Goal."

We then turn to the Hospital's judgment as to what constitutes an essential job function. This judgment comes from Dr. Uli's twelve-point list of essential job functions, which he prepared specifically at the request of the Hospital's human-resources department for its use in evaluating Dr. O'Donnell's request for accommodation. His list includes the expectation that Fellows "[a]ctively participate in all educational sessions of the division, with adequate preparation on assigned topic presentations. Take [sic] an active role in educating medical students, residents, nurses and other medical personnel." This list tracks the earlier nine-page document Uli prepared, and is tracked in the hospital's letter denying the requested accommodation.

Dr. Uli also testified, without contradiction, that the faculty had thoroughly discussed the matter and unanimously concluded that it was essential for a Fellow to participate, actively and unrehearsed, in medical discussions, and be evaluated thereon.

The district court ruled that there was no genuine issue of material fact that adequate participation in the Wednesday meetings was an essential function of the fellowship for which there was no alternative because

> [t]he faculty assert that it is essential; one of two written job descriptions state that it is essential; the fellows spend significant time every week in the departmental meetings and/or preparing for them; the faculty attend and *participate* in the meetings and are able to gain a collaborative perspective on the fellow's knowledge and experience; and all past fellows of the Fellowship Program have been evaluated

on their *participation* in weekly departmental meetings. (emphasis added).

Dr. O'Donnell made only one formal request for accommodation, on March 20, 2012.[4] In her earlier email to the faculty, on February 12, 2012, Dr. O'Donnell had merely proposed that she meet what she saw as the faculty's desire for more participation by being allowed to answer specific questions rather than volunteering her views and by doing more prepared presentations.

On March 20, however, she made a formal accommodation request, supported later by the appropriate Health Care Provider Certification Form, wherein her treating doctor stated on May 3, "I would recommend not to evaluate employee performance on case conference, particularly unrehearsed." The doctor indicated Dr. O'Donnell's need for accommodation was permanent, and that the accommodation was needed "probably during the rest of the fellowship." The Hospital read this as Dr. O'Donnell's request for accommodation -- exemption from all evaluation of her participation at Wednesday meetings. Dr. O'Donnell contends, however, that the requested accommodation was limited to not being asked to participate by "unrehearsed presentations

Dr. O'Donnell also argues that two of seven faculty members thought such accommodations could be made and actually started providing these requested accommodations. However, the only record support for this argument is depositions from two of the faculty members (ironically the only two members that she has named as defendants other than Dr. Uli, the chair of the faculty) who merely said that those two persons individually had sought to follow her requests and ask questions to draw her out and bring her in to the conversation. They say nothing whatsoever about the request not to be evaluated on her performance or that other members of the faculty might rely on her active participation. In addition, the June 14, 2012 involuntary-leave

---

[4] It appears that Dr. O'Donnell received the appropriate ADA form from Mr. Rebello on March 19, and hospital HR staff acknowledged that she had received the form. Per her email, she dropped off the form with human resources on March 20. The actual form does not appear in the record.

letter from the director of human resources to Dr. O'Donnell states: "In order to provide you time to fully consider this letter and its impact on your fellowship, *UHCMC will continue to temporarily provide the requested accommodation* until the end of the current fellowship year, June 30, 2012." (emphasis added) However, there is no indication in the letter, or in the cited deposition testimony, that any change was ever made in the method of evaluation of Dr. O'Donnell's work at the Wednesday meetings, or what the "requested accommodation" had meant in the previous month or in the remaining sixteen days of her fellowship year. Since she was being placed on leave, little would change in the remaining days. Nor is there any evidence that the two cited faculty members had actually done anything different after February, other than perhaps being more active in asking questions in an attempt to draw out Dr. O'Donnell.

Dr. O'Donnell argues that the Hospital in fact had conflicting definitions of "participation" in Wednesday meetings and thus created a genuine issue of material fact whether it was an essential function. However, an examination of the written documents shows no real conflict as to essential functions. The "Expectation of Fellows" document specifically addresses participation in the Wednesday discussion meetings. The document labeled "Goals of the Fellowship Program" is just that – a statement of the ultimate outcome sought by the program – medical knowledge, research ability, and patient case skills.

Dr. Uli's twelve-point list, on the other hand, though admittedly created after O'Donnell's ADA accommodation request and at the request of human resources, quite closely tracks the detailed Expectations document created the previous year. It does not introduce a new function that is not addressed in the original list. In addition, it was the joint opinion of the faculty, as reflected in the letter of June 14 and in earlier faculty discussions, that active participation was an essential function, which was in line with the earlier Expectations document and with Dr. Uli's

list. Therefore, there is no genuine issue of material fact that active and adequate participation in the Wednesday meetings, and being evaluated thereupon just as the Fellows are evaluated on other areas in the list such as patient care competence, medical knowledge, and research progress, is one of the essential features of the job. And since the medical support for her accommodation request specifically says that she cannot participate and be evaluated on that function, she cannot perform an essential function of the job and therefore is not qualified. This claim thus fails.

## B. Failure to Engage in an Interactive Process

When an employee with a disability requests an accommodation, the ADA mandates that an employer must engage in an "individualized inquiry" based on an "interactive process" to determine whether the employee's disability disqualifies her from a particular position. 29 C.F.R. § 1630.2(o)(3); *Rorrer*, 743 F.3d at 1040. "Once an employee requests an accommodation, the employer has a duty to engage in an interactive process." *Hostettler*, 895 F.3d at 857. Failure to engage in this mandatory interactive process amounts to an independent violation of the ADA "if the plaintiff establishes a prima facie showing that he proposed a reasonable accommodation." *Rorrer*, 743 F.3d at 1041. The purpose of the process is to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome these limitations. "A proper evaluation involves consideration of the applicant's personal characteristics, his actual medical condition, and the effect, if any, the condition may have on his ability to perform the job." *Keith v. County of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013).

"[B]oth parties have a duty to participate in good faith" in the interactive process. *Kleiber*, 485 F.3d at 871. Once the employee proposes an initial accommodation, "the employer has the burden of showing how the accommodation would cause an undue hardship, but the employer is not required to propose a counter accommodation in order to participate in the interactive process

in good faith"—though "proposing counter accommodations may be additional evidence of good faith." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202–03 (6th Cir. 2010). If the interactive process was triggered but not successfully resolved, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Kleiber*, 485 F.3d at 871 (quoting *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996)).

Dr. O'Donnell filed a formal request for disability accommodation with the Hospital on March 19, 2012. After she made these requests, the response from the Hospital was that the Hospital suggested that she take a leave of absence from the program for 12 months (unpaid, but with health benefits). The district court held this was sufficient evidence of the Hospital's good-faith effort to participate in the interactive process. There is no indication from O'Donnell as to what other process should have occurred or might have been productive. If, as shown above, she was unable to perform the essential features of the job, that creates an undue hardship for the Hospital, and the only matter that could be accommodated would be how could the Hospital help to restore or improve her ability to do the job. The Hospital's response, as shown by the faculty's academic decision, included a counterproposal that Dr. O'Donnell stay in the program for an additional year, in hopes that she would be able to return to making progress, as her doctor's note indicated was a possibility.

## C. Constructive Discharge

Dr. O'Donnell's only federal discrimination claim not barred by the statute of limitations was her claim of constructive discharge. A constructive-discharge claim requires a finding that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Talley*, 542 F.3d at 1107 (citations omitted). The Hospital placed Dr. O'Donnell on a mandatory unpaid leave of absence in response

to her requests for accommodation, but only after she refused the Hospital's offer of a one-year extension of her fellowship to allow her to meet the standards of the program. The district court held that the Hospital had a legitimate non-discriminatory reason for doing so, as her doctor had informed the Hospital that she could not perform an essential function of her position (active and adequate participation in Wednesday meetings). But, in so doing, the Hospital put Dr. O'Donnell in the untenable position of being still technically employed as a Fellow while not being paid, and lacking the ability to obtain a new job without tendering her resignation as a Fellow, which is exactly what happened. To this end, the Hospital's decision requiring Dr. O'Donnell to go on involuntary unpaid leave of absence without pay was a constructive discharge.

Common sense dictates that if an employee is prohibited from coming to work, the employee "cannot perform any of his job functions, essential or otherwise." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015). The moment a person is placed on an unpaid leave of absence, especially where as here it purportedly is in an effort to give a person time to rejoin a previous position, with some prospect that it would occur, the action may not be adverse. However, when, as here, the leave continues, with no apparent prospect of it being resolved satisfactorily, and the person ultimately resigns, at that point a constructive discharge can occur as a reasonable person could not be expected to continue in that situation.

However, there was no pretext for discrimination here. The discharge was based on her inability to perform an essential job function, as shown above. In addition, her performance had been criticized more than six months before her formal accommodation request, based on the same work-performance problems. Indeed, the Performance Alert covers many of the same areas noted in the evaluations and Remediation Plan that antedated her complaint. There is thus no temporal

proximity between the general complaints on her performance made by the faculty and the formal accommodation request.

### D. Disparate Treatment

Dr. O'Donnell also claims disability discrimination based on disparate treatment. Disparate treatment and retaliation claims are indirect-evidence claims based on circumstantial evidence where the determinative issue is the employer's intent. Such claims must be evaluated under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *McDonnell Douglas* requires that Dr. O'Donnell present a prima facie case of discrimination, which creates a rebuttable presumption that discrimination occurred and shifts the burden to the Hospital to articulate a legitimate non-discriminatory reason for taking the challenged employment action. If the Hospital satisfies its burden, Dr. O'Donnell must prove that the Hospital's proffered reason was actually a pretext to hide unlawful intent. *McDonnell Douglas*, 411 U.S. at 802. There are three ways to show pretext: 1) the proffered reason had no basis in fact; 2) the proffered reason did not actually motivate the employer's action; or 3) the proffered reason was insufficient to motivate the employer's action. *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400-01 (6th Cir. 2009).

Dr. O'Donnell alleges that although she was disabled, she was could perform the essential functions of her job with accommodation but was treated less favorably that other non-disabled fellows. In order to establish a prima facie claim of disparate-treatment disability discrimination under the ADA, Dr. O'Donnell must show that 1) she was disabled; 2) she was otherwise qualified for the job, with or without reasonable accommodation; 3) she suffered an adverse employment decision; 4) her employer knew or had reason to know of her disability; and 5) similarly situated employees were treated more favorably. *Rosebrough v. Buckeye Valley High School*, 582 F. App'x 647, 651 (6th Cir. 2014) (citations omitted)

The district court held that even if Dr. O'Donnell could establish the first two steps, that she was disabled and qualified for the job, she failed to establish that she suffered an adverse employment action, which is typically marked by a significant change in employment status, including hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

Dr. O'Donnell listed 13 instances of disparate treatment compared to other Fellows. These include allegations that: she was not provided the same amount of time for orientation as other fellows; she was assigned a presentation without the same preparation time that was given to other fellows; she was forced to cover late, non-urgent consults while no other Fellow was required to do so; she was called by her first name in front of patients and their families; she was given clinical assignments without the same notice as other fellows; she was forced to contact patients directly to reschedule appointments; she was routinely expected to see another doctor's patients; and she was routinely expected to cover additional clinic work.

We agree with the district court that these complaints do not rise to the level of an adverse employment action, as they did not result in significant change in her employment status or benefits. As we held in *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc), *aff'd*, 548 U.S. 53 (2006), adverse employment actions are typically marked by a "significant change in employment status," including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 798 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)). But a "bruised ego" or a "mere inconvenience or an alteration of job responsibilities" is not sufficient to constitute an adverse employment action. *Id.* at 797. These allegations are simply the type of complaints that arise in a difficult professional environment. None of them amounted

to any sort of change in pay or benefits, nor in title, nor constituted any type of demotion. *See also Mitchell v. Vanderbilt Univ*., 389 F.3d 177, 182-83 (6th Cir. 2004).

### VII.  Retaliation Claim

The ADA and corresponding Ohio disability law prohibit retaliatory actions against employees who oppose, report, or participate in investigations of conduct by employers that allegedly violates these statutes.  42 U.S.C. § 12203(a); Ohio R. Code § 4112.02(I).  A retaliation claim is independent from and does not rise or fall with the success or failure of the underlying discrimination claim.  A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) (quotations and citations omitted).

To succeed, Dr. O'Donnell must show that: 1) she engaged in protected activity; 2) her employer was aware of the protected activity; 3) her employer took an adverse action against her; and 4) there was a causal connection between the protected activity and the adverse action.  *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).  The burden of establishing an adverse action in the retaliation context can be less onerous than in the anti-discrimination context.  *Michael v. Caterpillar Financial Services Corp*., 496 F.3d 584, 596 (6th Cir. 2007).  The employee need only have a good-faith belief that the practice about which they are complaining is unlawful.  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000).  If a plaintiff shows very close temporal proximity, the burden shifts to the employer to articulate non-discriminatory reasons for its actions, but the burden of persuasion remains with the plaintiff.  *Mickey v. Zeidler Tool & Die Co*., 516 F.3d 516, 526 (6th Cir. 2008).

Dr. O'Donnell alleges the following were acts of retaliation: 1) the Hospital declined to adequately investigate her complaints; 2) Dr. Uli filed a Performance Alert against Dr. O'Donnell less than two weeks after she sent her February email to the faculty concerning her performance issues; 3) the Hospital stopped the accommodations she had sought and allegedly obtained from two members of the faculty; 4) the Hospital placed her on involuntary unpaid leave of absence in response to her formal discrimination complaint; and, 5) the Hospital interfered with her ability to gain new employment after she resigned from the fellowship program.

The district court held that Dr. O'Donnell did engage in protected activity by complaining to the Hospital that she was discriminated against on the basis of her disability and race. However, the district court concluded that Dr. O'Donnell suffered no adverse action and therefore was not retaliated against. The only item that would potentially support a retaliation claim would be the constructive discharge, as discussed above. The other alleged retaliatory actions are either not supported by evidence (interference with her ability to gain new employment), do not reach the level of an adverse action (not adequately investigating her complaints), or are related to the Performance Alert.

"Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler*, 516 F.3d at 525. Only two of Dr. O'Donnell's retaliation claims meet the requirement of temporal proximity. On February 11, 2012, Dr. O'Donnell emailed human resources complaining of continued discrimination by the program faculty. The next day, February 12, 2012, Dr. O'Donnell sent an email to the fellowship faculty where she addressed their concerns about her participation in the Wednesday meetings and made her proposed requests

in response.    Seventeen days later, Dr. Uli sent Dr. O'Donnell a Performance Alert for unsatisfactory performance in her fellowship.  But this was not the first such notice.

The Performance Alert was only one of many negative performance reviews, starting with first-year evaluations and the entry of a Remediation Plan, six months before her request, based on the same work-performance problems.  Ultimately, the Performance Alert was based on performance problems quite similar to those that had been noted in earlier evaluations and the alert occurred before any formal request for accommodation.  Her informal email to the faculty does not create enough of a temporal connection to the Performance Alert and certainly not to her being placed on leave months later, in the face of this evidence.

In summary, the district court did not err in granting summary judgment on each of Dr. O'Donnell's claims.  Her federal claims, with the exception of constructive discharge, are time barred.  Her constructive discharge was an adverse action, but was justified by her performance in the program, her inability to perform an essential job function, and the absence of a genuine issue as to whether the reasons given for her discharge were pretextual.  Her Ohio law claims for disability discrimination, denial for a reasonable accommodation, and failure to engage in an interactive process were also properly the subject of summary judgment, for the reasons set forth above.

## VIII.

We therefore AFFIRM the judgment of the district court granting summary judgment to defendants.

**JANE B. STRANCH, Circuit Judge, concurring.** Though the entirety of this record leads me to concur in today's decision, I write separately to explain more fully how the Defendants failed to engage appropriately in an interactive process. The employer's duty to engage in a meaningful interactive process has long been recognized to be "mandatory." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007). Where an employee is qualified for a position with or without a reasonable accommodation, failure to engage in the interactive process is actionable. *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017). "Employers must engage in a 'good faith' process and an 'individualized inquiry' to determine whether a reasonable accommodation can be made." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 857 (6th Cir. 2018) (quoting *Rorrer v. City of Stow*, 743 F.3d 1025, 1045 (6th Cir. 2014)).

In my view, Defendants' engagement in the interactive process was inadequate. There is ample evidence in the record that no Defendant engaged in discussions with O'Donnell about her formal ADA request for accommodation to the extent the ADA and our precedents require. Uli never spoke with O'Donnell or her treating physician about the request. Narasimhan had never heard of Julie Chester, a UHC HR director with whom O'Donnell communicated about her complaints and her formal ADA accommodation request. And Chester herself testified that she did not follow up with O'Donnell on her request for accommodation and did not recall any specifics of engaging in an interactive process.

These key facts reflect a failure to satisfy our conjunctive standard that "[a]n employer has sufficiently acted in good faith when it readily meets with the employee, discusses any reasonable accommodations, *and* suggests other possible positions for the plaintiff." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010) (emphasis added). The relevant inquiry here is whether Defendants readily met with O'Donnell and actually discussed the accommodation.

When we have previously addressed this required proposal/counterproposal interaction, we have detailed those conversations at some length before finding that the employer engaged in the interactive process. *See, e.g.*, *id.*; *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir. 2015) (en banc). Here, by contrast, there were no discussions to be detailed. Defendants constructively discharged O'Donnell rather than suggest another possible position for her. This is not the "individualized inquiry" the ADA requires, *Hostettler*, 895 F.3d at 857, and the district court erred in concluding that no genuine dispute of material fact existed about whether Defendants engaged in an interactive process as they were required to do by law. *See* 29 C.F.R. § 1630.2(o)(3).

I describe Defendants' failure here to emphasize a key point: we hold employers to the requirement to engage in an *interactive* process. *See, e.g.*, *Hostettler*, 895 F.3d at 857; *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 840 (6th Cir. 2018). Doing so comports with one of the fundamental purposes of the ADA: "to ensure that employers do not disqualify applicants and employees based on 'stereotypes and generalizations about a disability, but based on the actual disability and the effect that disability has on the particular individual's ability to perform the job.'" *Rorrer*, 743 F.3d at 1040 (quoting *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013)). Passage of the ADA was a recognition of the asymmetry of power and resources between working people with disabilities and their employers. Failing to engage in the interactive process exacerbates that asymmetry and damages the protective principles the ADA enshrines.